**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**MARY LOU ISER,**

        Plaintiff,

   v.                                                     Civil Action 2:16-cv-771
                                                                 Judge George C. Smith
                                                                 Magistrate Judge Jolson

**COMMISSIONER OF SOCIAL
SECURITY,**

        Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff, Mary Lou Iser, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying her Title II Disability Insurance Benefits application. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

**I.    BACKGROUND**

     **A.  Prior Proceedings**

Plaintiff filed for disability insurance benefits ("DIB") on March 25, 2013, alleging a disability onset date of September 24, 2010, with a date last insured of September 30, 2010. Doc. 10, Tr. 123–25, PAGEID #: 190–92). Her application was denied initially on June 26, 2013 (*Id.*, Tr. 141, PAGEID #: 208), and upon reconsideration on September 9, 2013 (*id.*, Tr. 145, PAGEID #: 212). Administrative Law Judge Jeffrey Hartranft (the "ALJ") held a hearing on March 27, 2015 (*id.*, Tr. 45, PAGEID #: 112), after which he denied benefits in a written decision on July 15, 2015 (*id.*, Tr. 10, PAGEID #: 77). That decision became final when the Appeals Council denied review on June 10, 2016. (*Id.*, Tr. 1, PAGEID #: 68).

Plaintiff filed this case on August 8, 2016 (Doc. 1), and the Commissioner filed the administrative record on October 14, 2016 (Doc. 10). Plaintiff filed a Statement of Specific Errors on December 28, 2016 (Doc. 14), the Commissioner responded on February 13, 2017, (Doc. 15), and Plaintiff replied on February 27, 2017 (Doc. 16).

### B. Relevant Testimony at the Administrative Hearing

Plaintiff's counsel began the hearing by explaining that Plaintiff was involved in a motor vehicle accident on September 24, 2010, her alleged date of disability. (Doc. 10, Tr. 54, PAGEID #: 121). He explained further that in the accident she sustained several injuries, but most significantly, she sustained a traumatic brain injury. (*Id.*).

Before Plaintiff began her testimony, the ALJ noted this was an "unusual case" because there were only six days between the alleged onset date and the date last insured ("DLI"). (Doc. 10, Tr. 58, PAGEID #: 125). The ALJ also stated that he would "obviously" consider evidence after Plaintiff's DLI, but he was concerned how that evidence would "relate back" to Plaintiff's conditions on the DLI. (Doc. 10, Tr. 59–60, PAGEID #: 126–27).

Plaintiff testified that she completed school through ninth grade and can read and write. (Doc. 10, Tr. 67–69, PAGEID #: 134–36). She also stated that she has never had a driver's license so she relies on her husband and daughter for transportation. (Doc. 10, Tr. 67, PAGEID #: 134). In terms of daily activities, Plaintiff testified that she wakes up at 4:30 a.m., packs her husband's lunch, takes her dog outside to the bathroom, sometimes takes him on walks, makes breakfast, and sometimes does laundry, the dishes, or vacuums, although if she is doing chores she often needs a break for 15 or 20 minutes. (Doc. 10, Tr. 81–86, PAGEID #: 148–53). In the summer, Plaintiff likes to plant flowers and cuts the grass with her push mower. (Doc. 10, Tr.

2

83–84, PAGEID #: 150–51). Finally, Plaintiff stated that on Fridays, she typically grocery shops. (Doc. 10, Tr. 84, PAGEID #: 151).

When asked what problems she was having after the accident, Plaintiff stated that sometimes she doesn't remember things. (Doc. 10, Tr. 75, PAGEID #: 142). Further, she explained that she had to go through vestibular, speech, and physical therapy. (Doc. 10, Tr. 88–89, PAGEID #: 155–56). Specifically, Plaintiff explained that she had to attend speech therapy because she couldn't think or say a lot of words. (Doc. 10, Tr. 93, PAGEID #: 160) ("My brain – sometimes like it'd move—it would move either too fast and I know – like I'm talking now—I would talk and then I'd get cut off. It's like it just shuts totally off[.]"). Plaintiff also testified that she sometimes forgets to tell her husband someone called for him, she forgets birthdays, and she forgets doctor's appointments. (Doc. 10, Tr. 96, PAGEID #: 163). Further, Plaintiff stated that as a result of the accident, she no longer can movies or read because of lack of concentration. (Doc. 10, Tr. 94–95, PAGEID #: 163).

Finally, Plaintiff testified that she used to run an in-home daycare, but after the accident, she "lost all of [her] kids . . . because the daycare kids had to go to other daycares" and by the time she was recovered, "they were already settled in new places." (Doc. 10, Tr. 100, PAGEID #: 167).

### C. Relevant Medical Background

As a result of the automobile accident on September 24, 2010, Plaintiff suffered a concussion, left retroperitoneal and adrenal stranding, left upper extremity laceration, left facial laceration, left chest wall contusion, and left temporal bone fracture. (Doc. 10, Tr. 275, PAGEID #: 342).

3

Plaintiff had a positive loss of consciousness at the scene of the accident but was conscious upon arrival at the hospital. (*See id.*, Tr. 275, PAGEID #: 342) ("Plaintiff had a GCS [Glasgow Coma Scale] of 15 upon arrival"). At the hospital, a CT of the brain revealed the ventricular and cisternal spaces were within normal limits for Plaintiff's age and there was no acute intracranial abnormality. (*Id.*, Tr. 296, PAGEID #: 363). During her hospital stay, Plaintiff underwent both physical and occupational therapy, and it was noted that she "did well with no complication." (*Id.*, Tr. 275, PAGEID #: 342). All of Plaintiff's injuries were treated non-surgically and her discharge notes on September 29, 2010, indicate that she was "doing well" and was "discharged home with self-care in no acute distress with a good prognosis." (*Id.*, Tr. 275–76 PAGEID #: 342–43). At the time of discharge, Plaintiff was given additional information regarding outpatient speech therapy. (*Id.*, Tr. 276, PAGEID #: 343).

Plaintiff was seen by Ms. Devereaux at the Fairfield Medical Center Speech Therapy Department on October 4, 2010, for an initial consultation. (*Id.*, Tr. 314, PAGEID #: 381). At that time, it was noted that Plaintiff had mild to moderate difficulty with adequate speed of auditory processing as evidenced in slow response to questions and test stimuli; mild decrease in retention of new and recent information; mild decrease in high thought processing and organization; and mild to moderate word retrieval difficulty. (*Id.*). Thus, Plaintiff was diagnosed with "cognitive dysfunction" and was recommended to undergo therapy for sixty minutes, once per week. (*Id.*).

After four therapy sessions, treatment notes on November 22, 2010, indicate that Plaintiff had 100% accuracy in appropriate speed for a trailing/tracking exercise indicating adequate attention and processing speed; she performed short-term memory exercises with 90% accuracy;

4

completed deduction puzzles with minimal assistance and 90% accuracy; provided logical solutions to functional problem scenarios with 90% accuracy; and demonstrated adequate word retrieval in explaining function of objections, explaining idioms, and naming items of a category. (*Id.*, Tr. 318, PAGEID #: 385). Overall, Plaintiff demonstrated "adequate cognitive skills for performing activities of daily living that she [was] used to performing," however it was noted that she did not exhibit or report to have the stamina, energy, strength, or coordination to return to her previous employment. (*Id.*, Tr. 318–19, PAGEID #: 385-86). Despite this, Plaintiff was discharged on November 22, 2010, due to goals of therapy being met and "demonstrating cognitive-linguistic function within normal limits." (*Id.*, Tr. 319, PAGEID #: 386).

Plaintiff also underwent physical therapy for dizziness, headache, blurred vision, and balance issues beginning on November 22, 2010. (*Id.*, Tr. 373, PAGEID #: 440). Plaintiff was discharged from physical therapy less than two months later, on January 14, 2011, after reporting 80% improvement in symptoms and function since beginning therapy. (*Id.*, Tr. 376, PAGEID #: 443).

Two years later, Plaintiff saw Dr. Philip Whatley for neuropsychological evaluations in October and November, 2012. (*Id.*, Tr. 336, PAGEID #: 403). Treatment notes state that the purpose of the evaluation was to assess Plaintiff's "current cognitive and emotional functioning in order to assist in treatment planning and implementation." (*Id.*). It also appears that Plaintiff was undergoing the evaluation at the request of her attorney. (*Id.*) (Under "Reason for Referral" it states that "Ms. Iser is a client of Attorney, Michael J. Rourke"). During the evaluation, Plaintiff reported balance problems, headaches, memory problems, and pain, but stated the only medication she took was Excedrin Migraine. (*Id.*, Tr. 338, PAGEID #: 405).

5

Dr. Whatley's treatment notes state that Plaintiff was seen for a comprehensive neuropsychological evaluation at Mt. Carmel West in October/November 2012, where a variety of tests were administered. (*Id.*, Tr. 345–46, PAGEID #: 412–13). At the outset, Dr. Whatley noted that Plaintiff did not perform well on Symptom Validity Indicators, as there was "a profound psychiatric overlay to her complaints of memory loss," and therefore any test result data should be interpreted in that light. (*Id.*, Tr. 346, 353, PAGEID #: 413, 420). Overall, Plaintiff performed within functional limits on the testing that measured memory functioning, but she performed poorly on measures of attention and concentration. (*Id.*, Tr. 348, PAGEID #: 415). Dr. Whatley opined that Plaintiff's "performance on measures overall memory functioning is consistent with her measures of intellectual functioning. That is, she shows poor performances or low average performances on measures of verbal comprehension and perceptual reasoning consistent with poor academic achievement." (*Id.*, Tr. 348–49, PAGEID #: 415–16).

Dr. Whatley's overall impression was that Plaintiff showed signs of "severe psychiatric illness including the very real possibility of posttraumatic stress disorder." (*Id.*, Tr. 350, PAGEID #: 417). He also diagnosed Plaintiff with depression, anxiety, and obsessive compulsive disorder. (*Id.*). Dr. Whatley explained that Plaintiff's significant post-traumatic stress disorder would likely require intensive treatment, and noted her reports of significant and chronic physical, mental, and sexual abuse during her childhood. (*Id.*, Tr. 353, PAGEID #: 420). Further, Dr. Whatley stated that although Plaintiff performed poorly on measures of brain functioning, "psychiatric factors (PTSD) could explain this." (*Id.*, Tr. 354, PAGEID #: 421). Ultimately, Dr. Whatley determined:

> [Plaintiff] is in need of immediate treatment. She should be under the care of a doctoral-level psychologist with expertise in treating PTSD (and ideally post

6

concussive syndrome. That is, she is likely continuing to show mild symptoms from her head injury including decreased concentration and poor problem solving). A consultation with a psychiatrist should also be considered. It is possible that with the proper treatment, [Plaintiff] will evidence an improvement in her thinking abilities, an improvement in her emotional functioning, and a reduction in her pain.

(*Id.*).

### D. The ALJ's Decision

The ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine; status post temporal bone fracture; obesity; a post-concussion syndrome with speech, language, and memory impairments; and borderline intellectual functioning. (Doc. 10, Tr. 12, PAGEID #: 79). The ALJ also addressed Plaintiff's minimal degeneration of the thoracic and lumbar spines; hypothyroidism, gastroesophageal reflux disease; headaches; and some mild hearing loss in the right ear, but found these impairments were non-severe. (*Id.*, Tr. 12–13, PAGEID #: 79–80).

Further, the ALJ held through the date last insured, September 30, 2010, Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (*Id.*, Tr. 14, PAGEID #: 81). The ALJ extensively discussed, *inter alia*, why Plaintiff's mental impairment did not meet or medically equal the criteria of listing 12.02. (*Id.*, Tr. 14–16, PAGEID #: 81–83). Specifically, the ALJ found that Plaintiff had only mild restriction of activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and had experienced no episodes of decompensation. (*Id.*, Tr. 15–16, PAGEID #: 82–83). Further, the ALJ noted that these limitations were reflected in the opined RFC, which was as follows:

> [T]hrough the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant is

precluded from climbing ladders, ropes, and scaffolds. She could frequently balance. She would be limited to occasional overhead reaching with the left arm and frequent reaching with the left arm in all other directions. The claimant should avoid exposure to workplace hazards, including moving machinery, parts, and unprotected heights. Further, she could perform simple, routine, repetitive tasks involving only simple work related decisions with few if any workplace changes, and have only occasional contact with the public.

(*Id.*, Tr. 16–17, PAGEID #: 83–84). In making this determination, the ALJ stated he had considered all symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as opinion evidence. (*Id.*).

The ALJ also found that some of Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were not entirely credible, (*id.*, Tr. 18, PAGEID #: 85), and listed various inconsistencies in Plaintiff's testimony regarding her daily activities and her subjective complaints (*id.*, Tr. 20–21, PAGEID #: 87–88). The ALJ also noted that the record contained inconsistent statements. (*Id.*, Tr. 21, PAGEID #: 88). For example, Plaintiff reported that she was depressed and anxious since the car accident, yet did not seek treatment for the condition until her neuropsychological evaluation in 2012. (*Id.*). Additionally, Plaintiff testified that she still has speech problems and forgets words, but she was discharged from speech therapy within two months of her accident because she was demonstrating cognitive and linguistic function within normal limits. (*Id.*). In yet another example, the ALJ noted Plaintiff testified that problems with attention and concentration prevent her from being able to read and watch movies; however she reported in a form submitted to Social Security in January 2014 that she enjoyed watching television, movies, and completing crossword puzzles. (*Id.*).

In terms of the weight assigned to the providers, the ALJ assigned little weight to the

8

opinion of Dr. Whatley because he assessed Plaintiff outside of the relevant time frame (two years after her DLI), and there was no other medical evidence that showed Plaintiff had any mental health impairment prior to her DLI. (*Id.*, Tr. 22, PAGEID #: 89). Further, Dr. Whatley provided no formal functional limitations on how the claimant would be limited as a result of any conditions he found. (*Id.*). The ALJ also assigned some weight to the speech therapist, Ms. Deveraux's, opinion that Plaintiff was capable of performing her activities of daily living, but little weight to her opinion that Plaintiff was unable to engage in her past work. (*Id.*, Tr. 21–22, PAGEID #: 88–89).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

In her Statement of Specific Errors, Plaintiff argues that: (1) it was unreasonable for the

ALJ to conclude that she had the RFC to perform light work limitations during the narrow time from her alleged onset date through her date last insured (Doc. 14 at 7–8); (2) the ALJ erred in failing to obtain the testimony of a medical expert with a specialty in neurology (*id.* at 8–10); and (3) the ALJ committed reversible error by discounting the evaluation report of Dr. Whatley regarding Plaintiff's head injury (*id.* at 11–12).

### A. ALJ's RFC Analysis and Conclusion

Plaintiff argues that because she was released from the hospital one day prior to her DLI, and upon release it was recommended that she attend therapy, it was unreasonable for the ALJ to conclude that she had the RFC to perform light work. (Doc. 14 at 7). Further, Plaintiff contends that the ALJ failed to consider whether she continued to be disabled for at least 12 months, as required by the Social Security Act. (*Id.*). Plaintiff argues Dr. Whatley's evaluation demonstrated significant cognitive and mental impairment more than two years after the accident, showing Plaintiff did not regain the capacity to return to work within a 12–month period. (*Id.*).

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). Nevertheless, substantial evidence must support the

Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

As noted above, the ALJ found that through the DLI, Plaintiff retained the RFC to perform light work, except she was precluded from climbing ladders, ropes and scaffolds. (Doc. 10, Tr. 17, PAGEID #: 84). The Court finds the ALJ's RFC was well supported by both medical evidence and Plaintiff's testimony. In discussing the physical aspect of Plaintiff's RFC, the ALJ noted that with therapy, Plaintiff significantly improved her cervical range of motion and neck flexion within normal limits; she maintained good strength in the upper extremities with no sensory deficits; her reflexes were symmetrical and she exhibited only mild tenderness in her cervical paraspinal muscles; and Plaintiff herself stated that her cervical spinal pain and impairment was 80 to 90 percent improved. (*Id.*, Tr. 19, PAGEID #: 86). Even still, the ALJ considered her cervical spine issue and reduced Plaintiff's RFC to light exertional work. (*Id.*).

Further, Plaintiff's temporal bone fracture and facial laceration were treated nonsurgically and were noted to have healed nicely. The ALJ also noted that "[t]he record was devoid of any evidence suggesting the fracture did not heal or resulted in any complications," and thus did not limit Plaintiff. (*Id.*). As to Plaintiff's post-concussive syndrome, the ALJ considered all of the medical evidence, including the fact that Plaintiff reported temporary speech, language, and memory deficits. (*Id.*). However, medical records showed that Plaintiff showed only mild decreases in retention of new and recent information and high level thought processing. (*Id.*). Moreover, Plaintiff was discharged from speech therapy less than two months after the accident because she had met her therapy goals and was "demonstrating cognitive-linguistic function within normal limits." (*Id.* (citing *id.*, Tr. 319, PAGEID #: 386)). Finally, the

ALJ explicitly stated that he reviewed and considered Dr. Whatley's assessment, but found it was not relevant to the time period in question and did not provide any formal functional limitations to incorporate into Plaintiff's RFC. (*Id.*, Tr. 22, PAGEID #: 89). Thus, it is clear the ALJ considered medical evidence well after the six-day window between the alleged onset date and the DLI, but reasonably concluded she was not disabled for a period of twelve months.

The ALJ also considered Plaintiff's testimony in evaluating her RFC, but found her testimony, and allegations in general, were not entirely credible. (*Id.*, Tr. 20, PAGEID #: 87). The Sixth Circuit has held that the Court must accord great deference to an ALJ's credibility assessment, particularly because the ALJ has the opportunity to observe the demeanor of a witness while testifying. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ stated expressly that a number of issues called into question the credibility of Plaintiff's allegations. (*Id.*, Tr. 20, PAGEID #: 87). For example, she testified at the hearing that she has problems with attention and concentration, and is unable to read, watch movies or complete tasks. (*Id.*, Tr. 95–96, PAGEID #: 162–63). Yet, she reported in a form submitted to Social Security that she enjoyed watching television, watching movies, and completing crossword puzzles, all of which require concentration. The ALJ pointed to other inconsistencies like the fact that Plaintiff reported she has difficulty finding words, but the record was devoid of any deficits during her hearing or doctor's appointments. (*Id.*, Tr. 21, PAGEID #: 88).

Finally, and perhaps most notably, no doctor opined that Plaintiff had any functional or work limitations, either physically or mentally. And the daily activities Plaintiff testified to were "not restricted to the extent that she would be precluded from the range of work assessed herein." (Doc. 10, Tr. 20, PAGEID #: 87). Plaintiff reported being able to bathe and dress herself;

complete household chores, such as washing dishes, doing laundry, mopping, and vacuuming the floors; shopping and preparing meals; caring for her dog, including taking him on walks; mowing the grass and planting flowers; and going camping. (*Id*, Tr. 21, PAGEID #: 88). These reported daily activities support the ALJ's opined RFC, and are not consistent or indicative of disability.

In the absence of any limitations from a treating physician, as well as an explicit finding that Plaintiff's subjective complaints were discounted because of inconsistencies in the record, when reviewing the "record as a whole," the Court finds it contains substantial evidence to support the ALJ's RFC decision. *See Berry v. Astrue*, No.1:09CV000411, 2010 WL 3730983, at *5 (S.D. Ohio June 18, 2010).

### B. Failure to Obtain Testimony of Medical Expert

Plaintiff next argues that pursuant to HALLEX I-2-5-34, the Social Security Administration's Hearings, Appeals, and Litigation Law Manual, the ALJ was required to obtain a medical expert opinion when considering whether her impairments medically equaled Listing 12.02. (Doc. 14 at 8). This argument has been rejected.

> [T]he Sixth Circuit has characterized HALLEX as a source of "guiding principles, procedural guidance and information" to ALJs and agency staff. *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 397 (6th Cir. 2008) (quoting HALLEX § 1–1–001)). That said, it must be understood that "[w]hile the HALLEX procedures are binding on the Social Security Administration, they are not binding on courts reviewing the administration's proceedings." Thus, [an] attempt to ground a reversible due process violation solely on the Commissioner's purported lack of adherence to some provision of HALLEX must necessarily fail.

*Sito v. Comm'r of Soc. Sec.*, No. 3:15 CV 2551, 2017 WL 168496, at *7 (N.D. Ohio Jan. 17, 2017). Accordingly, to the extent that Plaintiff's argument is solely premised on the idea that the ALJ failed to adhere to a HALLEX provision, that argument is unpersuasive.

Plaintiff also argues, however, that under SSR 96-6p, the ALJ should have obtained an updated medical expert opinion. (Doc. 14 at 8).

> SSR 96–6p deals with the issue of medical equivalence. It clarifies or re-emphasizes the fact that '[a]n updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made,' and provides that obtaining such an opinion is mandatory '[w]hen additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.'

*Norah v. Comm'r of Soc. Sec.*, No. 2:13-CV-981, 2014 WL 3845829, at *6 (S.D. Ohio Aug. 5, 2014), *report and recommendation adopted sub nom. Norah v. Colvin*, No. 2:13-CV-981, 2014 WL 5447331 (S.D. Ohio Oct. 22, 2014).

What Plaintiff fails to acknowledge, though, is that an ALJ's decision not to obtain an additional medical opinion "forms the basis for reversal or remand only when the record is not sufficiently clear for the ALJ to be able to make the necessary medical decisions." *Norah*, 2014 WL 3845829, at *6. And the ALJ "has discretion to determine whether additional evidence is necessary." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (citing *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001)). Here, Plaintiff has not shown that the record was inadequate for the ALJ to make a decision regarding disability. To the contrary, the ALJ extensively discussed Listing 12.02, and correctly laid out the standard to satisfy the "paragraph B" and "paragraph C" criteria. (Doc. 10, Tr. 14–17, PAGEID #: 81–84). Ultimately, the ALJ found that Plaintiff had only a mild restriction of activities of daily living; moderate difficulties in social functioning; moderate difficulties with regard to concentration, persistence, or pace; and had experienced no episodes of decompensation. (*Id.*, Tr. 15–16, PAGEID #: 82–83). Moreover, there was no evidence that Plaintiff had an inability to function outside a highly

supportive living arrangement—Plaintiff herself noted that she was capable of bathing, dressing, and preparing meals, *inter alia*, independently. (*Id.*, Tr. 16, PAGEID #: 83). Thus, when analyzing Listing 12.02, the ALJ reasonably concluded that this was not a case where additional medical evidence was needed. *See Norah*, 2014 WL 3845829, at *6.

It is also worth noting that it is Plaintiff's burden, not the ALJ's, to show that the medical evidence equaled Listing 12.02. *See Ferguson*, 628 F.3d at 275 (6th Cir. 2010) ("The burden lies with the claimant to prove that she is disabled."). The fact that Plaintiff felt that more evidence should have been presented regarding her potential to equal Listing 12.02 falls partially on her, as it was her responsibility to "present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) (citing *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)). Thus, the Court finds no error in the ALJ's failure to obtain an additional medical opinion.

### C. Evaluation of Dr. Whatley's Opinion

In Plaintiff's final assignment of error, she argues that the ALJ committed reversible error by using his own lay opinion to determine that her condition did not meet or equal Listing 12.02, rather than rely on Dr. Whatley's opinion. (Doc. 14 at 11). Specifically, Plaintiff states that because Dr. Whaley "opined that her condition was severe" the ALJ "cannot decide that it is not based on his own visual observations and reading of the medical record." (*Id.*).

Plaintiff is mistaken. The ALJ, not a physician, ultimately determines whether a plaintiff satisfies a listing. *See Kidd v. Comm'r of Soc. Sec.*, 283 F. App'x 336, 340 (6th Cir. 2008) ("It is

well-settled that the ultimate issue of disability is reserved to the Commissioner."). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Further, "[i]n order to qualify for DIB, a claimant must 'establish the onset of disability *prior* to the expiration of [her] insured status.'" *Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 602 (S.D. Ohio 2015) (emphasis in original) (citing *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir. 1984)). Thus, when determining whether a Plaintiff is disabled, "the ALJ generally only considers evidence from the alleged disability onset date through the date last insured." *Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 (S.D. Ohio 2012); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 497–98 (6th Cir. 2006) ("In order to qualify for [] benefits, [Plaintiff] had to establish that she had a disability on or before her date last insured."). "However, evidence relating back to a claimant's prior condition, even though obtained after the date last insured, may be considered in an ALJ's disability determination." *Id.*

Here, the ALJ recognized that Dr. Whatley completed neuropsychological assessments in October and November 2012, and reviewed and considered his findings. (Doc. 10, Tr. 22, PAGEID #: 89). However, the ALJ also noted that "there [was] no other medical evidence within the evidentiary record as a whole that show[ed] the claimant was treated for any mental health impairment prior to her date last insured or immediately after her date last insured." (*Id.*). And "[t]o be relevant to the disability decision, 'post-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured.'" *Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 602 (S.D. Ohio 2015) (citing *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003). Thus, it was appropriate for the ALJ to assign little weight to

16

Dr. Whatley's opinion and find that it "was not relevant to the time period in question and did not contain any relevant opinion evidence for the undersigned to weigh." (*Id.*).

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 14) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date: June 13, 2017 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE